**TRALON CORPORATION, Soil Remediation Service, Inc., and Bernard Glieberman, Plaintiffs,**

v.

**CEDARAPIDS, INC., Defendant.**

No. C 95–195–MWB.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

May 20, 1997.

Donald G. Thompson, Vernon P. Squires, Bradley & Riley, P.C., Cedar Rapids, IA, for Plaintiffs.

Stephen J. Holtman, Leonard T. Strand, Simmons, Perrine, Albright & Ellwood, P.L.C., Cedar Rapids, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING MOTION TO STRIKE COUNTERCLAIM AND MOTION FOR SUMMARY JUDGMENT

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ....................................816

II. STANDARDS FOR SUMMARY JUDGMENT ..............................817

III. FINDINGS OF FACT ...............................................818
 A. Uncontested Facts ............................................818
 B. Contested Facts .............................................822

IV. LEGAL ANALYSIS .................................................822
 A. Cedarapids' Motion For Summary Judgment ...........................822
 1. The Terms Of The Parties' Agreement ..............................822
 2. Plaintiffs' Warranty Claims .....................................824
 a. Sufficiency of representations ...............................824
 b. SRS' right to consequential damages ...........................826
 3. Plaintiffs' Fraudulent Misrepresentation Claims ......................826
 a. Fraudulent misrepresentation under Iowa law .....................827
 b. Sufficiency of representations ...............................827
 c. Evidence of knowledge of falsity ..............................828
 4. The Availability Of Equitable Recision As A Remedy ....................829
 5. The Viability of Tralon's Indemnity Claim............................830
 B. Plaintiffs' Motion To Strike Counterclaim...............................831

V. CONCLUSION .....................................................833

The lawsuit presently before the court is, depending upon which party's perspective is employed, either a classic case of buyer's remorse or an archetypal episode of misrepresentation taken by a manufacturer in order to consummate a sale. Defendant seeks summary judgment on all of plaintiffs' claims. Resolution of defendant's motion for summary judgment requires the court to examine and explore the contours of several areas of the law, including Iowa contract, commercial and tort law. Additionally, plaintiffs seek to strike defendant's counterclaim. This endeavor requires the court to examine the procedural question of whether the filing

of an amended complaint accords the responding party the right to assert a counterclaim without securing prior leave of the court.

## I. INTRODUCTION AND BACKGROUND

On June 16, 1995, plaintiffs Tralon Corporation ("Tralon"), and Soil Remediation Service, Inc. ("SRS") filed their original complaint in this lawsuit against defendants Cedarapids, Inc. ("Cedarapids") and General Electric Capital Corporation ("G.E. Capital"). Plaintiffs asserted claims against Cedarapids for breach of contract, misrepresentation, and recision flowing from Tralon's purchase of a portable soil reconditioning machine from Cedarapids in 1993.[1] On June 27, 1995, prior to any answer being filed, plaintiffs filed an amended complaint in this case. The amended complaint added a third plaintiff, Bernard Glieberman ("Glieberman"), who is alleged to have executed a personal guaranty to secure the purchase of the portable soil reconditioning machine. No new theories or claims were advanced in the amended complaint. Cedarapids filed its answer in this matter on August 16, 1995. On August 18, 1995, G.E. Capital filed its answer in this case and a counterclaim against Tralon and Glieberman for the amount due and owing on the contract for the purchase of the Cedarapids portable soil reconditioning machine sold to Tralon. On January 29, 1996, G.E. sold Tralon's note back to Cedarapids and assigned its rights under the note to Cedarapids. On March 18, 1996, plaintiffs voluntarily dismissed G.E. Capital as a defendant. G.E. Capital's counterclaim, however, was not dismissed at that time. On August 1, 1996, plaintiffs moved for leave to file a second amended complaint. On August 23, 1996, plaintiffs' motion to amend was granted and plaintiffs' Second Amended and Substituted Complaint was filed in this case. Plaintiffs' second amended complaint asserts claims against Cedarapids for breach of express warranty, breach of implied warranty, misrepresentation, recision/resti-

tution and indemnity. On October 1, 1996, Cedarapids filed its answer to plaintiffs' Second Amended and Substituted Complaint, and also a counterclaim against Tralon and Glieberman for the amount due and owing on the contract for the purchase of the Cedarapids' portable soil reconditioning machine sold to Tralon. Cedarapids states in its counterclaim that in January 1996, G.E. Capital assigned to Cedarapids all its rights and interests in a note and a guaranty executed by Tralon and Glieberman respectively securing Tralon's purchase of the portable soil reconditioning machine. On October 18, 1996, counterclaim plaintiff G.E. Capital voluntarily dismissed its counterclaim against counterclaim defendants Tralon and Glieberman. On October 21, 1996, plaintiffs moved to strike Cedarapids' counterclaim. Cedarapids filed a timely resistance to plaintiffs' motion to strike. On October 30, 1996, Cedarapids moved for leave to file the counterclaim that was included with its answer. Cedarapids also moved to modify the court's January 3, 1996, scheduling order to allow the filing of Cedarapids' counterclaim on October 1, 1996. Plaintiffs filed a resistance to Cedarapids' motion to file the counterclaim and amend the scheduling order.

On March 17, 1997, Cedarapids moved for summary judgment on all claims asserted against it by plaintiffs. Plaintiffs filed a timely resistance to Cedarapids' motion for summary judgment on April 14, 1997. The pending motion for summary judgment and motion to strike Cedarapids' counterclaim were then set for telephonic oral argument before the court on May 16, 1997. At the hearing, plaintiffs were represented by Donald G. Thompson and Vernon P. Squires of Bradley & Riley, P.C., Cedar Rapids, Iowa. Cedarapids was represented by Stephen J. Holtman and Leonard T. Strand of Simmons, Perrine, Albright & Ellwood, P.L.C., Cedar Rapids, Iowa. The parties have filed thorough and extensive briefs in support of their respective positions. Counsel were exceptionally well prepared for oral argument.

---

1. G.E. Capital was apparently named as a defendant because it had purchased, from Cedarapids, Tralon's promissory note for the remaining purchase price due on the soil preconditioning unit.

The oral arguments were well presented and reflected the hotly contested nature of this litigation. This matter is now deemed fully submitted.

The court turns first to the standards applicable to motions for summary judgment, then to a discussion of the undisputed facts as shown by the record and the parties' submissions, and finally to the legal analysis of whether Cedarapids is entitled to summary judgment on any of plaintiffs' claims. Finally, the court will turn to the issue of plaintiffs' motion to strike Cedarapids' counterclaim.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. . . . *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(a)–(c) (emphasis added); *see also Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Reliance Ins. Co. v. Shenandoah S., Inc.,* 81 F.3d 789, 791 (8th Cir.1996); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir. 1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir. 1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[2] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here plaintiffs, and give plaintiffs the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) *(quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct.

---

2. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel,* 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

993, 994, 8 L.Ed.2d 176 (1962)); *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996); *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996); *Munz*, 28 F.3d at 796; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield*, 939 F.2d 666, 667 (8th Cir.1991), cert. denied, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party, Cedarapids, bears "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53); *see also Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). Cedarapids is not required by *Rule* 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Plaintiffs are required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach*, 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985) (quoting *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), cert. denied, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), cert. denied sub nom. *Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison*, 28 F.3d at 66.

In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Quick*, 90 F.3d at 1376–77; *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If plaintiffs fail to make a sufficient showing of an essential element of a claim with respect to which they have the burden of proof, then Cedarapids is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247. With these standards in mind, the court turns to consideration of Cedarapids' motion for summary judgment.

### III. FINDINGS OF FACT

#### A. Uncontested Facts

The record reveals that the following facts are undisputed. Plaintiff Tralon is a Michigan Corporation with its headquarters in West Bloomfield, Michigan. Plaintiff SRS is a Wisconsin corporation which is engaged in the business of remediating polluted soil in

order to render it non-hazardous. Plaintiff Glieberman is a resident of the State of Michigan. Defendant Cedarapids is an Iowa corporation, and a subsidiary of Raytheon Company, a Delaware corporation. Cedarapids.designs and manufactures soil handling equipment such as crushing plants, hammer mills and thermal plants.

Glieberman and Jan Schlabowske incorporated SRS on April 15, 1991. Glieberman, his wife, Sandra Glieberman, and Jan Schlabowske's wife, Bonnie Schlabowske, were the sole shareholders in SRS. Bonnie Schlabowske and Jan Schlabowske were president and vice president, respectively, of SRS.

SRS was based in Butler, Wisconsin, a suburb of Milwaukee, Wisconsin. It was projected that SRS was going to provide cleanup services for individuals and companies that had contaminated sites by remediating or removing contaminated soil from the site. It was intended that SRS would charge a per ton fee for its services. The thermal soil remediation process requires pre-processing contaminated soil into uniform pieces approximately two inches in size before the units can be remediated using intense heat. Neither Glieberman nor the Schlabowskes had ever worked in the field of soil remediation prior to the forming of SRS. Although formed in the spring of 1991, SRS did not commence soil remediation work until the fall of 1991. SRS did not purchase equipment for its soil remediation business, but instead leased equipment from Tralon. Glieberman owns 100% of the shares of Tralon. Tralon has no employees and is in the business of leasing property to other corporations.

In 1992, Jan Schlabowske received a marketing call from William Rauschkolb of Cedarapids. During subsequent conversations, Jan Schlabowske told Rauschkolb about the general problems SRS was having dealing with wet soil and clay in the thermal remedi-

ation process. Wet soil and clay are difficult to process because their high plasticity, or stickiness causes the materials to stick to equipment. SRS frequently encountered high plasticity materials at its job sites in Wisconsin. Jan Schlabowske indicated to Rauschkolb that SRS would be interested in purchasing a processing unit that could process wet soil and clay in a single pass through the processor. At that time, SRS was often required to send wet soil and clay through its processor several times before it was rendered suitable to be processed in SRS' thermal processing plant. Cedarapids' representatives assured Jan Schlabowske that Cedarapids could build a processing unit that would be able to handle all types of material, including wet soil and clay. Cedarapids' representatives also told Jan Schlabowske that they could build a processor that would be able to handle wet soil and clay in a single pass through the processor.

On December 8, 1992, Cedarapids sent SRS a quotation, quotation number 28794, for a processing unit, the Cedarapids Model SPC–1.[3] On January 21, 1993, SRS sent to Cedarapids its amendments to the December 8, 1992 quotation.[4] On January 24, 1993, Glieberman signed the December 8, 1992 quotation on behalf of Tralon even though the front of the quotation lists the customer as being SRS. On February 4, 1993, Tralon sent Cedarapids a ten percent down payment on the SPC–1.[5] On February 5, 1993, an equipment sales order was generated by Cedarapids.[6] The equipment sales order indicates that the order date was February 5, 1993.

Under Cedarapids' policies, Cedarapids would not commence construction of equipment such as the SPC–1 without written confirmation that the product was sold, and a contract to that effect. Nonetheless, on February 8, 1993, Cedarapids sent a quotation to

---

3. A copy of the December 8, 1992 quotation is attached to Rauschkolb's deposition as Exhibit 2.

4. A copy of SRS' amendments to the December 8, 1992 quotation is attached to Rauschkolb's deposition as Exhibit 3.

5. A copy of Tralon's February 4, 1993 down payment check for the SPC–1 is attached to

Rauschkolb's deposition as Exhibit 5. A copy of Tralon's February 4, 1993 letter, which accompanied its down payment on the SPC–1, is attached to Rauschkolb's deposition as Exhibit 4.

6. A copy of the February 5, 1993 equipment sales order is attached to Rauschkolb's deposition as Exhibit 11.

Tralon.[7] The second quotation, which also carried the quotation number 28794, listed certain terms and conditions on the reverse side of each page. The December 8, 1992 quotation did not carry any terms and conditions on its reverse side. The signature page of the February 8, 1993 quotation contains a space for the signor to initial in order to indicate that the signor has read the terms and conditions on the reverse side of the document.

A letter from Cedarapids to Glieberman accompanied the February 8, 1993 quotation and indicated the revisions that had been made to the December 8, 1992 quotation.[8] The February 8, 1993 letter states in pertinent part:

Attached you'll find a revised version of the quotation originally given to Mr. Schlabowske of Soil Remediation Service Inc..[sic] The revisions include:

1. Customer name has been changed from Soil Remediation Service Inc. to Tralon Corporation.

2. 15 HP rotary screw air compressor has been incorporated into the Unit as item J. and the price incorporated into the base unit price.

3. Have incorporated terms mutually agreed upon with Mr. Schlabowske into the quotation on page 3.

Please sign and date page three of this document and be sure to read the terms and conditions on the reverse side of the document and indicate with your initials in the appropriate place on page three that you have done so.

Feb. 8, 1993 letter at p. 1.

The reverse side of the February 8, 1993 quotation contains the following relevant provisions:

*Warranty:* There are no warranties with respect to this transaction other than products manufactured by Cedarapids Inc. are subject to the following standard warranty: Company's sole warranty to the Distributor and Distributor's customers on resale with respect to the Products sold hereunder is that said Products will be free from defect in material and workmanship for a period of six (6) months after shipment or one thousand (1000) hours of Product operation, whichever comes first. If the Buyer discovers within this period a defect in material or workmanship, the buyer must promptly notify the Company in writing. In no event shall notification be received by the Company later than (7) months after shipment. Such Parts shall be returned to the Company's manufacturing plant, transportation prepaid, for inspection by the Company to determine to its satisfaction that said Part or Parts are defective. Within a reasonable amount of time after notification and return of the Parts, Company will repair any defective Part or Parts. *Exclusions:* The Company does not warrant (a) any products, components or parts not manufactured by the Company, such products being subject only to such warranties, if any, as made by their respective manufacturers; (b) damage caused by the use of the Product or Products for purposes other than those for which it was designed; (c) damage caused by disasters such as fire, flood, wind and lighting; (d) damage caused by unauthorized attachments or modifications; (e) damage during shipment or; (f) any other abuse or misuse by the purchaser. THE FOREGOING WARRANTIES ARE EXPRESSLY IN LIEU OF OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

*Limitation of Remedies:* Buyer's sole and exclusive remedy against Company for any claim of any kind, including breach of warranty, negligence, strict liability in tort, and/or any other legal theory shall be for the repair and replacement of defective equipment or parts. In no case shall the Company be liable for any special, inciden-

---

**7.** A copy of the February 8, 1993 quotation is attached to Cedarapids' Appendix In Support Of Defendant's Motion For Summary Judgment as Exhibit C.

**8.** A copy of the February 8, 1993 letter that accompanied the quotation is attached to Cedarapids' Appendix In Support Of Defendant's Motion For Summary Judgment as Exhibit D.

tal, or consequential damages for lost profits, for loss of goodwill, for loss of use, for loss of savings and revenue, cost of capital, cost of any substitute equipment, facilities or services, downtime or the claims of third parties. No person, agent, sales representative, or distributor is authorized to give on the Company's behalf, any warranty other than the one herein expressed or to assume any liability pertinent to the equipment manufactured.

. . . . .

*Iowa Contract:* The terms hereof shall be construed and governed by the laws of the State of Iowa. This contract is the complete and exclusive statement of the agreement between the parties which supersedes and merges all prior proposals, understandings and all other agreements, oral and written, between the parties relating to the subject matter of this Contract. This Agreement is expressly made conditional on assent to the terms contained in this agreement, including the Company's warranty disclaimer.

Feb. 8, 1993 Quotation at pp. 2, 4, 6.

Although Glieberman signed the February 8, 1993 quotation on February 10, 1993, he did not initial the space on the document to indicate that he had read the terms and conditions on the reverse side of the document. The signature page of the February 8, 1993 quotation also contains a space for Cedarapids to acknowledge and date its acceptance of the quotation. This space is blank on the February 8, 1993 quotation.[9]

The Cedarapids SPC–1 was a prototype machine which incorporated various components into a single soil pre-conditioning unit. Cedarapids had never built or sold a SPC unit prior to its construction of the SPC–1 for SRS. The SPC–1 unit was delivered to SRS in May 1993.[10] SRS first used the SPC–1 unit at a small bioremediation project in Hartland, Wisconsin.[11] The SPC–1 per-

formed well at the Hartland site. After the Hartland project, the SPC–1 was next used at a bioremediation project near Waupun, Wisconsin. Both bioremediation projects at which the SPC–1 was used involved sandy soil and gravel. After the SPC–1 was used at the Waupun site, it was next employed at a thermal remediation site in Muskego, Wisconsin, the Benco site. The Benco site involved very heavy, very wet, sticky, clay soil. The Benco project commenced in December 1993. With wet, sticky soil or clay soil, the SPC–1 plugged, especially in the crusher unit. Following its use at the Benco site, SRS took the SPC–1 unit to a project it had in Illinois for Illinois Electric Power. SRS used the SPC–1 to mix coal and soil contaminated with coal and coal tar. The mixture of coal and soil was then burned in one of Illinois Electric Power's generators at the site. Following its use in Illinois, SRS next used the SPC–1 for a project in Tomah, Wisconsin. The soil at the Tomah project consisted of sandy soil and sandstone. The SPC–1 performed well at the Tomah site. Following its use at the Tomah site, SRS brought the SPC–1 to a site in central Wisconsin, but decided to use its Kohlberg processor at that site instead. After its use at the Tomah site, the SPC–1 was not again employed by SRS.

After delivering the SPC–1 to SRS, Cedarapids made a number of repairs or modifications to the SPC–1. Cedarapids redesigned the screen drive, added knife blades to the crusher unit, changed the speed of the crusher, replaced belts and replaced the rubber curtain in the crusher.

In May 1995, Jay Moulton called Andrew Green of Cedarapids. Moulton told Green that SRS could not use the SPC–1 because the soil processing unit on it plugged and could not process wet clay. Moulton inquired whether there was a way that Cedarapids could either buy the SPC–1 back or help to sell the machine. Moulton was subse-

---

9. Also left blank is the space on the signature page of the December 8, 1993 quotation for Cedarapids' acceptance of that offer.

10. The SPC–1 was delivered to a storage facility in Muskego, Wisconsin, that SRS used for storing equipment.

11. Bioremediation is an alternative to thermal remediation. Bioremediation involves mixing microorganisms with the contaminated soil and allowing the microorganisms to remediate the soil.

quently told by Green that there was nothing Cedarapids could do for SRS with regard to buying back the SPC–1 or helping SRS to sell the SPC–1. In the summer of 1995, Tralon ran a magazine advertisement to sell the SPC–1. Tralon priced the SPC–1 at $249,000.

After commencing this case, Tralon brought suit against SRS in Wisconsin state court. Tralon and SRS subsequently reached a settlement in the Wisconsin litigation. As part of the settlement, SRS was able to set off $520,000 of Tralon's claim as damages attributable to the SPC–1. Cedarapids declined to defend Tralon in the Wisconsin litigation against SRS' claims related to the SPC–1.

### B. Contested Facts

1. Did Cedarapids accept the December 8, 1992 quotation from Tralon as an offer to purchase the SPC–1.

2. Was the February 8, 1993 quotation a confirmation of the terms of a previously reached agreement, or an invitation to plaintiffs to submit a new offer that contained new terms and conditions.

3. Were representations purportedly made by Rauschkolb related to the performance capabilities of the SPC–1 warranties, or merely expressions of opinion or commercial puffery.

4. Were Rauschkolb's statements, related to the performance capabilities of the SPC–1, expressions of opinion or representations of fact.

### IV. LEGAL ANALYSIS

*(including some further findings of fact)*

#### A. Cedarapids' Motion For Summary Judgment

##### 1. The Terms Of The Parties' Agreement

Cedarapids asserts in its motion for summary judgment that the February 8, 1993 quotation is the only agreement that exists between Tralon and Cedarapids and its terms are controlling in this litigation. Plaintiffs, on the other hand, contend that a genuine issue of material fact exists as to whether the February 8, 1993 quotation constitutes the agreement between Tralon and Cedarapids. Plaintiffs maintain that Tralon and Cedarapids had reached an agreement before the February 8, 1993 quotation, and that the February 8, 1993 quotation merely constituted a confirmation of the prior agreement between Tralon and Cedarapids. Resolution of this issue requires the court to briefly review the fundamentals of contract law.

An offer and an assent manifested by act or conduct constitute a contract. The existence of a contract is a question of fact to be determined by consideration of all facts and circumstances. *Audus v. Sabre Communications Corp.,* 554 N.W.2d 868, 871 (Iowa 1996); *Davenport Bank & Trust Co. v. State Cent. Bank,* 485 N.W.2d 476, 480 (Iowa 1992); *Dallenbach v. Mapco Gas Prod., Inc.,* 459 N.W.2d 483, 486 (Iowa 1990). However, the interpretation of contractual terms is a legal issue for the court. *Davenport Bank & Trust Co.,* 485 N.W.2d at 480; *Chariton Feed & Grain v. Harder,* 369 N.W.2d 777, 785 (Iowa 1985). Under Iowa law, an offer is a " 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his [or her] assent to that bargain is invited and will conclude it.' " *Magnusson Agency v. Public Entity Nat'l Co. Midwest,* 560 N.W.2d 20, 26 (Iowa 1997) (quoting *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 285 (Iowa 1995) )(quoting in turn Restatement (Second) of Contracts § 24); *accord Fosson v. Palace (Waterland), Ltd.,* 78 F.3d 1448, 1452 (9th Cir. 1996) (citing Restatement (Second) of Contracts § 24 (1981)); *Bourque v. F.D.I.C.,* 42 F.3d 704, 708 (1st Cir.1994) (citing Restatement (Second) of Contracts § 24 (1981)); *Day v. Amax, Inc.,* 701 F.2d 1258, 1263 (8th Cir.1983) (citing Restatement (Second) of Contracts § 24 (1981)). An acceptance is a manifestation of the assent to the offer, as evaluated under an objective standard. *Holman Erection v. Orville E. Madsen & Sons, Inc.,* 330 N.W.2d 693, 695 (Minn.1983) (citing Restatement (Second) of Contracts § 19

(1979)).[12] Although it was once the law, under the "mirror image" rule, that an offer had to be accepted exactly "as is" or the response amounted only to a counter-offer, UCC § 2–207 changed all this in the case of merchants.[13] This section, adopted in Iowa as Iowa Code § 554.2207, allows merchants to contract for the sale of goods without having to negotiate and draft formal contracts. With the adoption of § 2–207, a merchant can accept an offer made on the offeror's form by using his own standardized form so long as the response does not "materially alter" the terms of the offer.

■ The general rule is price quotations are not offers, but rather constitute mere invitations to enter into negotiations or to submit offers. *Manhattan Const. Co. v. Rotek, Inc.*, 905 F.Supp. 971, 974 (N.D.Okla. 1995); *Bergquist Co. v. Sunroc Corp.*, 777 F.Supp. 1236, 1248 (E.D.Pa.1991); *Master Palletizer Sys., Inc. v. T.S. Ragsdale Co.*, 725 F.Supp. 1525, 1531 (D.Colo.1989), *aff'd*, 937 F.2d 616 (10th Cir.1991); *Corinthian Pharm. Sys., Inc. v. Lederle Labs.*, 724 F.Supp. 605, 609 (S.D.Ind.1989); *Maurice Elec. Supply Co., Inc. v. Anderson Safeway Guard Rail Corp.*, 632 F.Supp. 1082, 1087 (D.D.C.1986); *see Thos. J. Sheehan Co. v. Crane Co.*, 418 F.2d 642, 645 (8th Cir.1969) (concluding that quotation in case constituted only an invitation to plaintiff to make an offer). A buyer's purchase order submitted in response to a price quotation is ordinarily considered the offer. *Manhattan Constr. Co.*, 905 F.Supp.

at 974; *Bergquist*, 777 F.Supp. at 1248; *Master Palletizer*, 725 F.Supp. at 1531. With these principles in mind, the court turns to consider the quotations at issue here.

■ Plaintiffs direct the court's attention to several facts that would suggest Tralon and Cedarapids had reached an agreement before the February 8, 1993 quotation. Cedarapids' December 8, 1992 quotation was made subject to Cedarapids' acceptance. The inclusion of this condition precludes the quotation from operating as an offer because SRS' assent could not consummate the deal. *See Crest Ridge Construct. Group, Inc. v. Newcourt, Inc.*, 78 F.3d 146, 152 (5th Cir. 1996) (Benavides, J., concurring). Because Cedarapids' quotation was not itself an offer, but instead constituted an invitation to submit an offer, the fact that the quotation was originally directed to SRS is irrelevant. Glieberman's subsequent signing of the quotation on behalf of Tralon and its return to Cedarapids constituted a valid offer, the acceptance of which constitutes a valid contract.[14] Cedarapids did not send an explicit confirming memorandum accepting this purchase order offer. However, the UCC makes clear that a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by the parties. *See* Iowa Code § 554.2204; *see also Wells, Waters & Gases, Inc. v. Air Prods. & Chems., Inc.*, 19 F.3d 157, 160 (4th Cir.1994) (holding under Virginia version of UCC that contract came into existence as result of con-

**12.** The Restatement (Second) of Contracts, § 19, contains the following observations regarding conduct as a manifestation of assent:

(1) The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.

(2) The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.

(3) The conduct of a party may manifest assent even though he does not in fact assent. In such cases a resulting contract may be voidable because of fraud, duress, mistake, or other invalidating cause.

Restatement (Second) of Contracts § 19(1)–(3) (1979).

**13.** In explaining the "mirror image" rule, the Iowa Supreme Court observed:

The rule is well settled that in a contract by offer and acceptance, the acceptance must conform strictly to the offer in all its conditions, without any deviation or condition whatever. If there is any qualification attached which calls for further understanding or correspondence in order to determine the final meeting of the minds of the parties, the acceptance falls short of closing the contract.

*Shell Oil Co. v. Kelinson*, 158 N.W.2d 724, 728 (Iowa 1968).

**14.** Indeed, the signature page of the quotation states: "You may offer to purchase by signing here, or by sending purchase order to Cedarapids, Inc." Beneath this statement, Tralon's name was placed on the blank space next to the statement "Offer By".

duct by parties recognizing existence of contract); *Axelson, Inc. v. McEvoy–Willis,* 7 F.3d 1230, 1233 (5th Cir.1993) (noting that conduct by parties evidenced existence of contract); *Apex Oil Co. v. Vanguard Oil & Serv. Co.,* 760 F.2d 417, 422 (2d Cir.1985) ("the existence of a contract may be established through conduct of the parties recognizing· the contract.").[15] The question of whether an agreement was reached is generally a fact question. *See Dravo Corp. v. Zuber,* 804 F.Supp. 1182, 1185 (D.Neb.1992), *aff'd,* 13 F.3d 1222 (8th Cir.1994); *MacFarlane v. Tri–Star Pictures, Inc.,* 627 F.Supp. 626, 628 (E.D.Mo.1986).

▪ Here, evidence of Cedarapids' conduct following Tralon's transmittal of the December 8, 1992 quotation, raises a material question of fact as to whether a contract was made following that transmittal. Specifically, Cedarapids' apparent acceptance of Tralon's down payment check and the statement in its letter of February 8, 1993, thanking Tralon for its order of the SPC–1, both evidence the formation of a contract between Tralon and Cedarapids. Additionally, Cedarapids prepared the February 5, 1993 sales order following its receipt of the December 8, 1992 quotation from Tralon, but before it had sent the February 8, 1993 quotation to Tralon. Yet, there is also strong evidence that Cedarapids did not accept the December 8, 1992 quotation. The most significant evidence of this is Cedarapids' transmittal of the February 8, 1993 quotation to Tralon. This quotation would appear entirely unnecessary if Cedarapids had already accepted Tralon's offer in the December 8, 1992 quotation. Further, language in the accompanying letter, noting the revisions from the original December 8, 1992 quotation and the addition of the terms and conditions found on the reverse side of the quotation, indicate that the deal was not yet a *fait accompli.* Because there are material issues of fact as to which of Tralon's offers to purchase the SPC–1 was accepted by Cedarapids and what the terms of the contract are between Cedarapids and Tralon, Cedarapids' motion for summary judgment is denied as to those portions of its motion that are grounded on the assumption that the February 8, 1993 quotation provided the terms of the contract between Tralon and Cedarapids.[16]

### 2. Plaintiffs' Warranty Claims

Cedarapids also challenges plaintiffs' warranty claims along several fronts. Because the court has concluded that material issues of fact exist as to what constitutes the terms of the contract between Tralon and Cedarapids, the court need not discuss Cedarapids' assertions that the language found in the February 8, 1993 quotation limits the availability of such claims in this case.

### a. Sufficiency of representations

Cedarapids contends that the purported representations made by its employee William Rauschkolb regarding the SPC–1 are too indefinite and vague to constitute express warranties.[17] Rather, Cedarapids maintains

---

**15.** Iowa Code § 554.2204, which deals with contract formation in general, states:

 1. A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

 2. An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

 3. Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Iowa Code § 554.2204.

**16.** Because the factual dispute here concerns what offer to purchase was actually accepted by Cedarapids, the issue of the precise terms of the contract between the parties does not present a classic "battle of the forms" under UCC § 2–207. The term "battle of the forms" refers to "the not uncommon situation in which one business firm makes an offer in the form of a preprinted form contract and the offeree responds with its own form contract." *Northrop Corp. v. Litronic Indus.,* 29 F.3d 1173, 1174 (7th Cir.1994).

**17.** It is uncontested that Rauschkolb represented to SRS and Tralon that the SPC–1 could handle virtually any solid feed material problems in a three-stage, closed loop process. Rauschkolb dep. at pp. 209–10. Rauschkolb further represented that the SPC–1 could eliminate multiple handling steps. *Id.* at p. 210. He also represented to SRS and Tralon that the SPC–1 could eliminate extra equipment and personnel. *Id.* Additionally, he told SRS personnel that the SPC–1 was an impact mill equipped with air blasters that could shred clay or crush solids

that Rauschkolb's statements regarding the SPC–1 were mere commercial puffery. Plaintiffs, on the other hand, hotly dispute Cedarapids' characterization of Rauschkolb's representations.

An express warranty may be created by any affirmation of fact or promise made by a seller which relates to the goods. Iowa Code § 554.2313(1)(a). Iowa Code § 554.2313(1)(a) provides that an express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Further, section 554.2313(1)(a) states that the express warranty must serve as part of the "basis of the bargain." [18] The language creating an express warranty need not contain special phrases or formal words such as guarantee or warranty. Iowa Code § 554.2313(1)(b). In fact, a seller need not have intended that the language create an express warranty. Iowa Code § 554.2313(2). Every statement made by a seller, however, does not create an express warranty. Under Iowa law, "affirmations relating merely to the seller's opinion or commendation of goods do not create a warranty." *Falcon Equip. Corp. v. Courtesy Lincoln Mercury, Inc.*, 536 F.2d 806, 809 (8th Cir.1976) (applying Iowa law); *accord Overstreet v. Norden Labs., Inc.*, 669 F.2d 1286, 1290 (6th Cir.1982); *Royal Business Machs. v. Lorraine Corp.*, 633 F.2d 34, 41 (7th Cir.1980).[19]

The Court of Appeals for the Seventh Circuit held in *Royal Business Machs., Inc.*, that

The decisive test for whether a given representation is a warranty or merely an expression of the seller's opinion is whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment.

*Id.* (construing Indiana law and citing *Weiss v. Rockwell Mfg. Co.*, 9 Ill.App.3d 906, 293 N.E.2d 375 (1973)). In *Royal Business Machs., Inc.*, the Court of Appeals concluded that statements made by the seller of copy machines that the maintenance costs of the copiers would remain "very low" was not an express warranty but merely "statements of the seller's opinion." *Id.* at 42. The court, however, found that statements by the machines' seller that the copiers would require service calls no more than every 7,000 to 9,000 copies constituted an express warranty. *Id.* at 43.

The representations purportedly made by Rauschkolb here all related to the performance capabilities of the SPC–1: that the SPC–1 could handle virtually any solid feed material problems in a three-stage, closed loop process; that the SPC–1 could eliminate multiple handling steps; that the SPC–1 could eliminate extra equipment and personnel; that the SPC–1 was an impact mill

such as rock. *Id.* Finally, Rauschkolb represented that the SPC–1 unit was mobile and would provide a steady flow of preconditioned soil to any thermal processing unit. *Id.*

**18.** Iowa Code § 554.2313 states in full that:
1. Express warranties by the seller are created as follows:
 a. Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
 b. Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
 c. Any sample or model which is made part of the basis of the bargain creates an express

warranty that the whole of the goods shall conform to the sample or model.
2. It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

**19.** General statements to the effect that goods are "the best," *Thompson Farms, Inc. v. Corno Feed Prods.*, 173 Ind.App. 682, 366 N.E.2d 3 (1977), are in "good shape," *Guess v. Lorenz*, 612 S.W.2d 831 (Mo.Ct.App.1981), or will "last a lifetime," *Performance Motors, Inc. v. Allen*, 280 N.C. 385, 186 S.E.2d 161 (1972), are generally regarded as expressions of the seller's opinion or "puffing" and do not create an express warranty.

equipped with air blasters that could shred clay or crush solids such as rock; and that the SPC–1 unit was mobile and would provide a steady flow of preconditioned soil to any thermal processing unit. These representations more than merely state "an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion." *Id.* at 41. Instead, these representations concerned matters and information of which only the manufacturer of the SPC–1 would have knowledge. The representations here resemble the performance representations made in *Royal Business Machs., Inc.* that the Seventh Circuit found to constitute express warranties.

It is important to remember the circumstances in which these representations purportedly arose. The existence of an express warranty depends upon the particular circumstances surrounding the representation. *Overstreet,* 669 F.2d at 1290; *Sessa v. Riegle,* 427 F.Supp. 760, 766 (E.D.Pa.1977), *aff'd,* 568 F.2d 770 (3d Cir.1978) (table decision). The representations at issue in this case were allegedly made in response to statements by Schlabowske that SRS needed a machine that could process wet soil or clay, and that could process such material on one pass. SRS did not need another unit that could process dry material. It already had equipment that could perform those functions. Given this state of affairs, the representations by Rauschkolb were far beyond mere commercial puffery.[20] Rather, Rauschkolb's statements went to the very essence of SRS' performance requirements for its new soil preconditioning unit. The court concludes that such statements may constitute express warranties under Iowa Code § 554.2313(1)(a). Whether these statements constitute a warranty, as opposed to an expression of opinion, is a question for the trier of fact. *See Royal Business Machs.,* 633 F.2d at 43; *Gillette Dairy, Inc. v. Hydrotex*

*Indus., Inc.,* 440 F.2d 969, 974 (8th Cir.1971). Therefore, this portion of Cedarapids' motion for summary judgment is denied.

#### b. SRS' right to consequential damages

Cedarapids also seeks summary judgment as to SRS' claim of consequential damages based on the breach of express warranty. Clearly, SRS never entered into a contract with Cedarapids to purchase the SPC–1. Rather, Tralon was the contractual purchaser of the SPC–1. Under Iowa law, non-privity buyers cannot recover consequential economic loss damages under a theory of express or implied warranty. *Tomka v. Hoechst Celanese Corp.,* 528 N.W.2d 103, 107–08 (Iowa 1995); *Beyond the Garden Gate, Inc. v. Northstar Freeze–Dry Mfg., Inc.,* 526 N.W.2d 305, 309–10 (Iowa 1995); *accord Bruce v. ICI Americas, Inc.,* 933 F.Supp. 781, 788–89 (S.D.Iowa 1996). Because SRS is a non-privity buyer here, SRS cannot recover consequential economic loss damages under its warranty claims. Therefore, Cedarapids' motion for summary judgment is granted as to SRS' claim of consequential damages based on the breach of express warranty.

#### 3. Plaintiffs' Fraudulent Misrepresentation Claims

Cedarapids makes a three pronged attack on plaintiffs' fraudulent misrepresentation claims. First, Cedarapids asserts that plaintiffs' frauds claim are not viable due to operation of the terms of the February 8, 1993 quotation. Because the court has concluded that a material question of fact exists as to whether the February 8, 1993 quotation represents the terms of the agreement between Tralon and Cedarapids, the court need not determine the correctness of this theory today. Cedarapids' second line of attack is its theory that the alleged representations are

---

**20.** Cedarapids' reliance on the Sixth Circuit Court of Appeals' decision in *Jordan v. Paccar, Inc.,* 37 F.3d 1181 (6th Cir.1994) is unavailing. In *Jordan,* the manufacturer of a truck had produced a sales brochure in which it described the truck's fiberglass roofs as "strong, light, leakproof" and the trucks as "rock-solid." Applying Ohio's version of UCC 2–313, the Sixth Circuit concludes that these statements constituted mere commercial puffery and not express warranties. *Id.* at 1185. The performance based representations here, however, are far more detailed and performance oriented than the manufacturer's affirmations in *Jordan* concerning the general condition of the truck.

too vague to give rise to a claim of fraudulent misrepresentation. Finally, Cedarapids contends that plaintiffs possess no evidence that the alleged representations were false when made and made with the intent to deceive. After discussing the basic tenets required of a misrepresentation claim under Iowa law, the court will address Cedarapids' arguments concerning plaintiffs' fraudulent misrepresentation claims.

### a. Fraudulent misrepresentation under Iowa law

■ This court has previously discussed in detail the required elements of fraudulent misrepresentation under Iowa law:

"(1) a material (2) false (3) representation coupled with (4) scienter and (5) intent to deceive, which the other party (6) relies upon with (7) resulting damages to the relying party." *Bates v. Allied Mut. Ins. Co.*, 467 N.W.2d 255, 260 (Iowa 1991) (citing *Sinnard v. Roach*, 414 N.W.2d 100, 105 (Iowa 1987), which in turn cites *Hall v. Wright*, 261 Iowa 758, 766, 156 N.W.2d 661, 666 (1968), and also citing *Beeck v. Kapalis*, 302 N.W.2d 90, 94 (Iowa 1981)); *Air Host Cedar Rapids v. Cedar Rapids Airport Comm'n*, 464 N.W.2d 450, 453 (Iowa 1990) (telescoping the first three elements and stating the "intent" element differently, hence: "(1) a material misrepresentation; (2) made knowingly; (3) with intent to induce the plaintiff to act or refrain from acting; (4) upon which the plaintiff justifiably relies; and (5) damages," citing *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1237 (8th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988)); *Sinnard*, 414 N.W.2d at 105; *Robinson*, 412 N.W.2d at 565 (listing the elements in slightly different order as "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage," citing *Cornell); Cornell v. Wunschel*, 408 N.W.2d 369, 374 (Iowa 1987) (listing same elements, citing *B & B Asphalt Co. v. T.S. McShane Co.*, 242 N.W.2d 279, 284 (Iowa 1976)); *Kristerin Dev. Co. v. Granson Inv.*, 394 N.W.2d 325, 332 (Iowa 1986) (listing the elements as in *Air Host Cedar Rapids*, citing *Beeck v. Aqua-*

*slide 'N' Dive Corp.*, 350 N.W.2d 149, 155 (Iowa 1984)); *Beeck*, 350 N.W.2d at 155 (listing elements as in *Kristerin*, and quoting a prior decision in a related case, *Beeck v. Kapalis*, 302 N.W.2d 90, 94 (Iowa 1981)); *Citizens Sav. Bank v. Wild*, 512 N.W.2d 799, 801–02 (Iowa.Ct.App.1993) (citing *Irons); see also Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1237 (8th Cir.1987) (applying Iowa law and stating the factors as quoted in *Air Host Cedar Rapids), cert. denied*, 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).

Still more recently than this court's decision in *Utica Mut. Ins.*, the Iowa Supreme Court has reiterated that the elements of fraudulent misrepresentation, or "fraudulent inducement" to contract, are "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury or damage." *Hyler v. Garner*, 548 N.W.2d 864, 871 (Iowa 1996) (citing *McGough v. Gabus*, 526 N.W.2d 328, 331 (Iowa 1995)).

*Jones Distrib. Co. v. White Consol. Indus., Inc.*, 943 F.Supp. 1445, 1469–70 (N.D.Iowa 1996) (quoting *Utica Mut. Ins. Co. v. Stockdale Agency*, 892 F.Supp. 1179, 1192–93 (N.D.Iowa 1995)). Keeping these elements in mind, the court turns to consideration of Cedarapids' challenges to plaintiffs' fraudulent misrepresentation claims.

### b. Sufficiency of representations

■ Cedarapids asserts that Rauschkolb's statements were simply expressions of opinion and not representations of fact, and therefore are not actionable. It is true, as Cedarapids asserts, that under Iowa law, "a mere statement of honest opinion" does not give rise to a claim for fraud. *Hoefer v. Wisconsin Educ. Assoc. Ins. Trust*, 470 N.W.2d 336 (Iowa 1991). As the Iowa Supreme Court explained in *Hoefer*:

"A mere statement of an honest opinion, as distinguished from an assertion of fact will not amount to fraud, even though such opinion be incorrect. When the statements become representations of fact, or the expression of opinion is insincere and made to deceive or mislead, they may be treated as fraudulent. Whether such is

their quality and character is ordinarily a jury question."

*Id.* (quoting *International Milling Co. v. Gisch,* 258 Iowa 63, 73, 137 N.W.2d 625, 631 (1965)); *accord Midwest Printing, Inc. v. AM Int'l, Inc.,* 108 F.3d 168, 171 (8th Cir. 1997) (holding that expressions of opinion or puffing were not actionable representations under Missouri law); *Clardy Mfg. Co. v. Marine Midland Business Loans,* 88 F.3d 347, 359 (5th Cir.1996) (concluding that pure expression of opinion will not support action for fraud under Texas law); *Damon v. Sun Co.,* 87 F.3d 1467, 1477 (1st Cir.1996) (holding that under Massachusetts law opinions cannot be basis for claim of fraud); *Equity Capital Corp. v. Kreider Transp. Serv., Inc.,* 967 F.2d 249, 253–54 (7th Cir.1992) (concluding that in order to ground action in fraud, lie must be in form of statement of fact, not expression of opinion); *West v. Western Cas. & Sur. Co.,* 846 F.2d 387, 393 (7th Cir.1988) ("A statement that merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable misrepresentation."); *Lefebvre Intergraphics, Inc. v. Sanden Mach., Ltd.,* 946 F.Supp. 1358, 1364 (N.D.Ill.1996) (noting that alleged misrepresentation must be one of fact and not expression of opinion).

"Whether a statement is one of fact or of opinion depends on all the facts and circumstances of a particular case." *West,* 846 F.2d at 393 (citing *Buttitta v. Lawrence,* 346 Ill. 164, 178 N.E. 390, 393 (1931)). As the Seventh Circuit Court of Appeals observed in *West:*

A statement that, standing alone, appears to be a statement of opinion, nevertheless may be a statement of fact when considered in context. Courts focus on the circumstances surrounding the representation to determine whether the plaintiff may have justifiably relied on the opinion as though it were a statement of fact. *Peterson Indus.,* 584 F.2d at 169. Among the relevant factors in such a case are the access of the parties to outside information and the relative sophistication of the parties. The Illinois Supreme Court said in *Buttitta:*

Wherever a party states a matter which might otherwise be only an opinion, but does not state it as the expression of the opinion of his own, but as an affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such, then the statement clearly becomes an affirmation of the fact within the meaning of the rule against fraudulent misrepresentation.

*West,* 846 F.2d at 393 (quoting *Buttitta,* 346 Ill. 164, 178 N.E. at 393).

 Here, the court concludes that plaintiffs have made a sufficient factual showing to preclude summary judgment. The trier of fact could find, under the circumstances, that Rauschkolb's statements were not simply expressions of opinion, but representations of fact concerning the performance capabilities of the SPC–1. As discussed above, Rauschkolb's representations were allegedly made in response to inquiries by Schlabowske after being informed of the performance requirements that SRS desired in a soil preconditioning unit. Furthermore, the parties here did not have equal access to information regarding the SPC–1. Since it was a prototype unit, only Cedarapids' employees would have knowledge or access to information regarding its capabilities. Therefore, because a material question exists as to whether Rauschkolb's statements were expressions of opinion or representations of fact, the court denies this segment of Cedarapids' motion for summary judgment.

#### c. *Evidence of knowledge of falsity*

Cedarapids further contends that plaintiffs' fraudulent misrepresentation claims fail because plaintiffs cannot muster any evidence of scienter and intent to deceive. Plaintiffs counter that all they need show is evidence that Cedarapids' false representations were made with "reckless disregard for their truth or falsity." *Limited Flying Club, Inc. v. Wood,* 632 F.2d 51, 54–55 (8th Cir.1980) (holding under Iowa law that "[s]cienter requires a showing that false representations were made with knowledge that they were false, although that requirement may be met by showing that false representations were

made 'in reckless disregard of their truth or falsity.' ").

■ As the Iowa Supreme Court pointed out in *Beeck v. Aquaslide 'N' Dive Corp.*, 350 N.W.2d 149 (Iowa 1984):

Scienter and intent to deceive are closely related and "are shown not only when the speaker has actual knowledge of the falsity of his representations but also when he speaks in reckless disregard of whether his representations are true or false." *Grefe, supra,* 231 N.W.2d at 867; *Sedco International, S.A. v. Cory,* 522 F.Supp. 254, 324 (S.D.Iowa 1981), *aff'd,* 683 F.2d 1201 (8th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). The requirement of scienter is met "when the evidence shows [the] representations were made in reckless disregard of their truth or falsity." *B & B Asphalt v. T.S. McShane Co.,* 242 N.W.2d 279, 284 (Iowa 1976). "A false statement innocently but mistakenly made will not establish intent to defraud, but, when recklessly asserted, it will imply an intent to defraud." *Grefe, supra,* 231 N.W.2d at 867 (citing *Hall,* 261 Iowa at 768–72, 156 N.W.2d at 667–69); *see* W. Prosser, *Law of Torts* § 107, at 701 (4th ed.1971).

*Id.* at 155; *accord Magnusson Agency,* 560 N.W.2d at 26 (scienter "can be proved by showing that the defendant had actual knowledge of the falsity, possessed reckless disregard for the truth, or falsely stated or implied that the representations were based on personal knowledge or investigation."); *Hyler v. Garner,* 548 N.W.2d 864, 871 (Iowa 1996) (scienter can be proved " 'by showing that the defendant had actual knowledge of the falsity, possessed reckless disregard for the truth [or] falsely stated or implied that the representations were based on personal knowledge or investigation....' ") (quoting *McGough v. Gabus,* 526 N.W.2d 328, 331 (Iowa 1995); *B & B Asphalt Co., Inc. v. T.S. McShane Co.,* 242 N.W.2d 279, 284 (Iowa 1976) (holding that scienter requirement "is met when the evidence shows such representations were made in reckless disregard of their truth or falsity.")).

■ Here plaintiffs contend that Rauschkolb, Cedarapids' agent, made performance related representations regarding the SPC–1 when he did not in fact know whether the SPC–1 could meet those specifications. This factual scenario raises an issue of material fact as to whether Rauschkolb's representations were made in reckless disregard of their truth or falsity. Therefore, the court denies this portion of Cedarapids' motion for summary judgment.

### 4. *The Availability Of Equitable Rescission As A Remedy*

Cedarapids also attacks the viability of plaintiffs' claim for rescission. Cedarapids argues first that rescission is contrary to the terms of the February 8, 1993 quotation. Because the court has concluded that a material question of fact exists as to whether the February 8, 1993 quotation represents the terms of the agreement between Tralon and Cedarapids, resolution of this theory must await trial. Cedarapids further contends that rescission is not available in this case because of Tralon's delay in providing notice of revocation to Cedarapids.

■ Under Iowa law, the elements of an equitable claim for rescission based on misrepresentation are: "(1) a representation, (2) falsity, (3) materiality, (4) an intent to induce the other to act or refrain from acting, and (5) justifiable reliance." *Hyler,* 548 N.W.2d at 872. Unlike a claim of fraudulent misrepresentation, "even innocent misrepresentations may be sufficient to support an action for rescission." *Id.*

■ The general rule in Iowa is that "fraudulent misrepresentations leading to the creation of a contract give rise to a right of rescission." *Robinson v. Perpetual Serv. Corp.,* 412 N.W.2d 562, 568 (Iowa 1987); *accord Midwest Management Corp. v. Stephens,* 291 N.W.2d 896, 906 (Iowa 1980); *Maytag Co. v. Alward,* 253 Iowa 455, 464–66, 112 N.W.2d 654, 659–60 (1962). Here, for the reasons discussed above, the court has found that a material question of fact exists regarding plaintiffs' fraudulent misrepresentation claim. Because resolution of the fraudulent misrepresentation claim must await trial on the merits, the court concludes that Cedarapids' motion for summary judg-

ment cannot be granted as to plaintiffs' claim for equitable rescission.

### 5. *The Viability of Tralon's Indemnity Claim*

Finally, Cedarapids attacks Tralon's indemnity claim. Cedarapids contends that Tralon's indemnity claim is the result of a sham litigation between Tralon and SRS, and is an attempt by SRS to shift its consequential damages to Tralon. Cedarapids contends that Tralon's indemnity claim is precluded by the terms of the February 8, 1993 quotation and is not permitted under Iowa law. Since a material question of fact exists as to whether the February 8, 1993 quotation represents the terms of the agreement between Tralon and Cedarapids, resolution of Cedarapids' first argument cannot be disposed of by operation of a motion for summary judgment. Therefore, the court will turn to Cedarapids' second line of attack, whether such a claim for indemnity is permitted under Iowa law.

As the Iowa Supreme Court has observed: "Indemnity, a form of restitution, is founded on equitable principles; it is allowed where one person has discharged an obligation that another person should bear; it places the final responsibility where equity would lay the ultimate burden." *Hunt v. Ernzen,* 252 N.W.2d 445, 448 (Iowa 1977); *accord McCarthy v. J.P. Cullen & Son Corp.,* 199 N.W.2d 362, 371 (Iowa) ("The overriding purpose of indemnity is to place the loss on the one or ones who should rightfully or equitably bear it."). The Eighth Circuit has summarized Iowa law on the general subject of indemnity as follows:

> Iowa law recognizes several theories on which indemnity may be permitted: (1) express contract; (2) vicarious liability; (3) breach of an independent duty between the indemnitor and indemnitee; and (4) the primary or "active" tortious conduct of the indemnitor as compared to the secondary or "passive" tortious conduct of the indemnitee. Of these four grounds for indemnification, the first three are based upon a relationship existing between indemnitor and indemnitee, while the fourth ground is based solely on a common liability arising from the concurrent negligence of the parties.

*Hysell v. Iowa Public Serv. Co.,* 534 F.2d 775, 782 (8th Cir.1976) (citations omitted); *Farmers Co-op. Co. v. Stockdales' Corp.,* 366 N.W.2d 184, 186 (Iowa 1985) (quoting *Hysell,* 534 F.2d at 782); *accord American Trust & Sav. Bank v. United States Fidelity,* 439 N.W.2d 188, 190 (Iowa 1989); *Britt–Tech Corp. v. American Magnetics Corp.,* 487 N.W.2d 671, 673 (Iowa 1992); *Rees v. Dallas County,* 372 N.W.2d 503, 505 (Iowa 1985); *C.F. Sales, Inc. v. Amfert, Inc.,* 344 N.W.2d 543, 553–54 (Iowa 1983); *Sweeny v. Pease,* 294 N.W.2d 819, 821 (Iowa 1980).

Here, the parties' dispute centers on the third ground, whether Tralon can demonstrate a breach of an independent duty between the indemnitor and indemnitee. Tralon asserts that Cedarapids must indemnify it under the doctrine of implied contractual indemnity. As the First Circuit Court of Appeals observed regarding indemnity, the "right to indemnification will only be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility ... or when there is a generally recognized special relationship between the parties." *Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S.Auth.,* 693 F.2d 1,2–3 (1st Cir.1982). Here, there are no "special" or "unique" circumstances about the contractual relationship between Cedarapids and Tralon.[21] There is nothing striking or peculiar about this contract. Rather, it is a simple contract for the sale and purchase of a piece of equipment between two sophisticated parties. The courts have uniformly held that this buyer-seller relationship does not constitute a "special" or "unique" circum-

---

21. It should also be noted that under Iowa law, "[t]he breach of a general duty of care will not support a claim of indemnity." *Weggen v. Elwell–Parker Elec. Co.,* 510 F.Supp. 252, 254 (S.D.Iowa 1981); *see Iowa Power and Light Co. v. Abild Constr. Co.,* 259 Iowa 314, 144 N.W.2d 303, 309 (1966). Thus, even if Tralon had claimed that Cedarapids breached a general duty of care it had to Tralon, such allegations would not, in and of themselves, give rise to an indemnity claim.

stance justifying implied contractual indemnity. *See Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 346, 351 (2d Cir.1986); *Araujo*, 693 F.2d at 3; *Santisteven v. Dow Chem. Co.*, 506 F.2d 1216, 1219 (9th Cir.1974); *Roy v. Star Chopper Co.*, 442 F.Supp. 1010, 1019 (D.R.I.1977), *aff'd*, 584 F.2d 1124 (1st Cir.1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).

In *Goodpasture, Inc.*, the plaintiff, a purchaser of grain, brought suit against the seller to recover detention, dead freight and carrying charges incurred in relation to the parties' contract for the sale and shipment of grain. Plaintiff alleged an implied right of indemnification based on the contractual relationship between the parties. After plaintiff recovered on its indemnity theory at trial, the Second Circuit Court of Appeal reversed, holding that

> there is nothing special about the contractual relationship between [a grain seller] and [a grain buyer] that would warrant implying in fact a contract for indemnification. Their grain sale agreements were fairly ordinary commodities contracts. There is simply nothing in them or in the parties' dealings from which an agreement to indemnify "could fairly be implied".

*Zapico*, 579 F.2d at 719. If an implied contract for indemnification were to be found here, one would have to be found in nearly every commodities sale contract that lacked a clause excluding it, a result that would reverse all standard contract and indemnity law.

*Goodpasture, Inc.*, 782 F.2d at 351. Here, as in *Goodpasture, Inc.*, there is nothing special about the contractual relationship between Cedarapids and Tralon which would dictate the imposition of a right to "implied in fact" indemnification.[22] Therefore, the court concludes that Cedarapids is entitled to summary judgment on Tralon's indemnity claim.

## B. Plaintiff's Motion To Strike Counterclaim

■ Plaintiffs have moved to strike the counterclaim Cedarapids included in its answer to plaintiffs' amended complaint. Cedarapids contends that its counterclaim was permitted, without leave of the court, to include a new counterclaim in its required answer to plaintiffs' Second Amended Complaint. Thus, Cedarapids initially contends that it was entitled to assert any counterclaims it chose in its answer to the Second Amended Complaint, without requesting leave of the court, because the answers were not amended answers but rather were original answers to the Second Amended Complaint. Essentially, Cedarapids claims that

---

22. The only case Tralon cites in support of its position is an Illinois Appellate Court decision in *Zielinski v. Miller*, 277 Ill.App.3d 735, 740, 214 Ill.Dec. 340, 344, 660 N.E.2d 1289, 1293 (1995), *cert. denied*, 167 Ill.2d 571, 217 Ill.Dec. 670, 667 N.E.2d 1063 (1996). In *Zielinski*, the Illinois Appellate Court explained:

> Under the doctrine of implied contractual indemnity, where one party's breach of contract causes a second party to breach a separate contract with a third party, the second party may shift its contractual liability to the first party. *(Carrillo v. Jam Productions, Ltd.* (1988), 173 Ill.App.3d 693, 123 Ill.Dec. 326, 527 N.E.2d 964.)* Indemnity is justified in such instances because a party who breaches a contract can be held liable for damages which naturally arise from the breach, provided that such damages were reasonably within the contemplation of the patties as a probable result of the breach. *Case Prestressing Corp. v. Chicago College of Osteopathic Medicine* (1983), 118 Ill.App.3d 782, 74 Ill.Dec. 382, 455 N.E.2d 811.

*Zielinski*, 214 Ill.Dec. at 344, 660 N.E.2d at 1293. Thus, under Illinois approach, every contract could conceivably give rise to a claim of implied contractual indemnity. Clearly, if Iowa adopted Illinois broad view of implied contractual indemnity, under the facts of this case Tralon would be permitted to assert such a claim. Iowa, however, has not adopted such a view. It is axiomatic that in diversity cases the federal court is bound to apply the applicable state law in conformity with the decisions of the highest state court. On the other hand, "[i]t has limited discretion to adopt untested legal theories brought under the rubric of state law." *Affiliated FM Ins. Co. v. Trane Co.*, 831 F.2d 153, 155 (7th Cir.1987); *see A.W. Huss Co. v. Continental Casualty Co.*, 735 F.2d 246, 253 (7th Cir.1984). Absent some authoritative signal from the Iowa courts or the legislature, no justification exists for this court to extend the application of the doctrine of implied contractual indemnity in such a profound and unprecedented way. Whatever the merits or demerits of extending the doctrine of implied contractual immunity, the decision is more in keeping with the legislative process than with fettered discretion of a federal court sitting in diversity.

plaintiffs amended their complaint at their peril, opening themselves up to any and all counterclaims that Cedarapids chose to assert. Plaintiffs contend that defendants did not have an absolute right to add any counterclaims they chose in their answers to the Second Amended Complaint, because Rule 15 of the Federal Rules of Civil Procedure requires that a "party shall plead in response to an amended pleading ..." *Fed.R.Civ.P.* 15(a). Thus, plaintiffs argue, Cedarapids could only assert as of right in its answer to the Second Amended Complaint counterclaims that responded to the specific amendments made in the Second Amended Complaint.

The procedural question presented by plaintiffs' motion to strike is simply stated: did plaintiffs' filing of their amended complaint give Cedarapids the right to assert its counterclaim without securing prior leave of court? It is clear from the court's review of Federal Rules of Civil Procedure 13 and 15, that no explicit answer to the procedural question before the court is contained in the rules. A number of courts have attempted to harmonize Rules 13 and 15. *See Brown v. E.F. Hutton & Co., Inc.*, 610 F.Supp. 76 (S.D.Fla.1985); *Chrysler Corp. v. Fedders Corp.*, 540 F.Supp. 706, 712–13 (S.D.N.Y. 1982); *Joseph Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc.*, 50 F.R.D. 415, 419 (D.Del.1970). Upon review of these and other cases, the court is persuaded by the discussion of the interplay of Rules 13, governing counterclaims, and 15, governing amended pleadings, of the Federal Rules of Civil Procedure presented in *Brown* correctly synthesizes the concerns addressed in Rules 13 and 15. In *Brown*, the court held that "when a plaintiff files an amended complaint which changes the theory or scope of the case, the defendant is allowed to plead anew as though it were the original complaint filed by the Plaintiff." *Brown*, 610 F.Supp. at 78 (citing *Joseph Bancroft &*

*Sons Co.*, 50 F.R.D. at 419). As the court in *Joseph Bancroft & Sons Co.* recognized:

> Since the amended pleader chooses to redo his original work, and receives the benefit of this nunc pro tunc treatment, he can hardly be heard to complain that claims filed against him are improper because they should have been asserted in response to his original pleading.

50 F.R.D. at 419. The obvious corollary is that if an amended complaint does not change the theory or scope of the case, a decant must seek leave of court pursuant to Rule 15(a) before it can amend its answer to assert a counterclaim.

■ The court has compared the allegations found in the First Amended Complaint with the allegations in the Second Amended Complaint. Because the Second Amended Complaint here greatly expands both the factual allegations made by plaintiffs against Cedarapids as well as the scope of those claims, the court finds that under the circumstances present here, Cedarapids was entitled to a "fresh start" in answering Plaintiffs' Second Amended Complaint. Indeed, it would be inequitable to entertain the Plaintiffs' Second Amended Complaint without permitting Cedarapids to completely plead anew. In requesting permission to amend their complaint, plaintiffs asserted that it was necessary to amend the complaint to accurately reflect the status of the dispute. The addition of Cedarapids' counterclaim serves the same purpose since it reflects G.E. Capital's post-filing assignment to Cedarapids all its rights and interests in a note and a guaranty executed by Tralon and Glieberman, respectively, securing Tralons purchase of the SPC–1. Thus, the court concludes that Cedarapids did not act improperly in filing its new counterclaim without first seeking leave of the court to do so.[23] Therefore, plaintiffs' Motion To Strike Counterclaim is denied. Because the court has denied plaintiffs' Motion to Strike Coun-

---

23. In accordance with the provisions of Rule 15(a) of the Federal Rules of Civil Procedure, Cedarapids answer and counterclaim were required to be filed within ten days of service of the Second Amended Complaint. The answer and counterclaim were not served upon plaintiffs' counsel at that time but, rather, the answer and

counterclaim were filed on October 1, 1996. In short, Cedarapids answer and counterclaim were not filed in a timely manner. Nonetheless, the court holds that the technical requirements under Rule 15(a) should be waived in the instant case and Cedarapids' answer and counterclaim be allowed to stand.

terclaim, Cedarapids' Motion For Leave To File Supplemental Pleading And To Modify Scheduling Order Accordingly is denied as moot.

## V. CONCLUSION

Initially, the court concludes that because there are material issues of fact as to which document constituted Tralons offer to purchase the SPC–1 and what the terms of the contract between those parties are, Cedarapids' motion for summary judgment is denied as to those portions of its motion that are grounded on the assumption that the February 8, 1993 quotation provided the terms of the contract between Tralon and Cedarapids. The court further finds that the representations made by Cedarapids' employee Rauschkolb may constitute express warranties under Iowa Code § 554.2313(1)(a). Whether these statements constitute a warranty, as opposed to an expression of opinion, is a question for the trier of fact. Therefore, Cedarapids' motion for summary judgment on plaintiffs' warranty claims is denied. The court, however, grants Cedarapids' motion for summary judgment as to SRS' claim of consequential damages based on the breach of express warranty. Under Iowa law, non-privity buyers cannot recover consequential economic loss damages under a theory of express or implied warranty. Because SRS is a non-privity buyer here, SRS cannot recover consequential economic loss damages under its warranty claims. Regarding plaintiffs' fraudulent misrepresentation clams, the court concludes that plaintiffs have made a sufficient factual showing to preclude summary judgment because the trier of fact could find that, under the circumstances, that Rauschkolb's statements were not simply expressions of opinion, but representations of fact concerning the performance capabilities of the SPC–1. The court further finds plaintiffs' fraudulent misrepresentation claims do not fail because of a lack of evidence of scienter and intent to deceive. The court also concludes that because resolution of plaintiffs' fraudulent misrepresentation claims must await trial on the merits, Cedarapids' motion for summary judgment cannot be granted as to plaintiffs' claim for equitable rescission. With regard to Cedarapids' at-

tack on Tralon's indemnity claim, the court finds that there is nothing special about the contractual relationship between Cedarapids and Tralon which would dictate the imposition of a right to "implied in fact" indemnification. Therefore, the court concludes that Cedarapids is entitled to summary judgment on Tralon's indemnity claim. Finally, because plaintiffs' Second Amended Complaint changed the theory or scope of the case, Cedarapids did not act improperly in filing its new counterclaim without first seeking leave of the court to do so. The court therefore denies plaintiffs' Motion To Strike Counterclaim. Because the court denies plaintiffs' Motion to Strike Counterclaim, Cedarapids' Motion For Leave To File Supplemental Pleading And To Modify Scheduling Order Accordingly is denied as moot.

**IT IS SO ORDERED.**